In the Matter of the Application of JOHN F. JOYCE, Petitioner, for an Order Pursuant to Article 78 of the Civil Practice Act, against WILLIAM FELLOWES MORGAN, JR., as Commissioner of Public Markets of the Department of Markets of the City of New York, and Others, Respondents.

First Department, May 31, 1940.

*William P. Cavanaugh* of counsel [*Roy P. Monahan* and *Arthur C. Goldberg* with him on the brief], for the petitioner.

*Charles F. Murphy* of counsel [*William C. Chanler, Corporation Counsel*], for the respondents.

GLENNON, J. The petitioner, John F. Joyce, on March 31, 1939, was served with charges preferred by the commissioner of public markets of incompetency, misconduct and a violation of the rules of the department. The charges have been summarized as follows: (1) Failure to properly supervise the operation of a market area under his supervision; (2) permitting several floaters to operate in the market contrary to the rules of the department, and (3) absence from the market.

He was found guilty after a trial before the commissioner of public markets and was dismissed on April 30, 1939.

Petitioner entered the service of the city of New York on October 17, 1910. He resigned on April 1, 1919, and went into private business. He re-entered the city's service in July, 1923, and was assigned to the department of markets where he was employed as a supervisor, chief supervisor and inspector for a period of nearly sixteen years.

His record in the army shows that as a member of the Sixty-ninth New York Infantry, he served on the Mexican border from July 11, 1916, until the 1st of March, 1917. When war was declared in April of that year, together with the other members of his regiment, he became a part of the armed forces of the United States. He served his country in France as a soldier for a period of three years and received a decoration for bravery on the field of battle. He enlisted as a private and later was advanced to the ranks of a corporal, sergeant, first sergeant and second lieutenant. He was mustered out of the service as a second lieutenant and received an honorable discharge. Based upon these facts the petitioner claims, and properly so, that he is entitled to the benefits of sub-division 1 of section 22 of the Civil Service Law, which reads in part as follows: "* * * No person holding a position by appointment or employment in the State of New York, or in the several cities, * * * who is an honorably discharged soldier * * * having served as such * * * in the World war * * * shall be removed from such position except for incompetency or misconduct shown after a hearing upon due notice upon stated charges, and with the right to such employee or appointee to a review by certiorari. * * *."

The record shows that on June 14, 1921, the board of aldermen adopted an ordinance, which later was approved by the mayor, for the creation of what was known as the Upper First Avenue Market. This market was located on the avenue between One Hundred and Sixth and One Hundred and Sixteenth streets. It should be noted here that the charges against the petitioner were based upon his failure to supervise the peddlers who were wont to congregate in this area. It appears, however, that this market area was discontinued by a resolution of the board of estimate of the city of New York on February 3, 1938, and a new one to be known as the One Hundred and Fourteenth street market, covering from First to Second avenues, was created.

The specifications of the charges which were leveled against the petitioner indicate that the alleged acts upon which he has been found guilty occurred on March 24, 1939, more than a year after the upper First avenue market had been abolished. We make this statement since there is a grave question as to the right

of either the commissioner of markets or the petitioner to enforce rules and regulations of the department in a market area which has been abolished.

We will take up the charges in their inverse order since that is the way they are considered in the testimony. The third charge has been designated in the respondents' brief as " absence from the market." To sustain this charge, a witness named Kopelman testified in substance that he arrived at the market on the morning in question at a quarter to ten and did not see the petitioner until eleven o'clock. He said he rode on a First avenue bus from One Hundred and Sixth to One Hundred and Sixteenth streets. He got off at that point and walked on the westerly side of the avenue down to One Hundred and Sixth street where he arrived at ten-twenty. At that hour he telephoned Commissioner Morgan and then continued to walk up and down First avenue on the east and west sides until eleven o'clock when he saw the petitioner in front of the playground between One Hundred and Thirteenth and One Hundred and Fourteenth streets on First avenue.

Petitioner replying to this charge testified in substance that he reported for work close to nine o'clock that morning. He entered the playground at that time for the purpose of putting on his uniform cap. As was his custom, he spoke to the peddlers with reference to their permits, plates and also sidewalk obstructions. About five minutes to ten he re-entered the playground, which he designated as the Jefferson Park Pool, to comply with the regulation of the department to be at the telephone point, which was located therein, to receive calls. He testified: " I can't understand how Mr. Kopelman didn't see me. I was not only there before 11:00 o'clock but I was on call for the office by the telephone point. I got there about five minutes to ten and stayed until about fifteen minutes after ten." Kopelman shortly thereafter, as we have seen, put in his telephone call to the office. In a busy thoroughfare, such as we have on First avenue between One Hundred and Sixth and One Hundred and Sixteenth streets, it may well be that Kopelman, walking as he was on the easterly as well as the westerly sides of the avenue, may have missed the petitioner. In any event, the testimony which he gave was entirely negative in character and consequently insufficient to prove that petitioner was absent without leave between the hours of nine-forty-five and eleven o'clock.

Charge numbered (2) is summarized by respondents as follows: " Permitting several floaters to operate in the market contrary to the rules of the department." One Robert Huse, a confidential examiner, testified that he accompanied Commissioner Morgan

to the market where they arrived at eleven-five o'clock. The commissioner and he alighted from the latter's car at the northwest corner of One Hundred and Sixteenth street and First avenue. They walked south on the westerly side of the avenue to One Hundred and Sixth street without seeing the petitioner. Retracing their steps, walking in a northerly direction, they met the petitioner at One Hundred and Seventh street. Referring to this particular charge, Huse said: "A floater is a licensed or unlicensed peddler who roams the streets of the City." He testified 'that there are some 3,000 licensed and approximately 12,000 unlicensed floaters on the streets. According to Huse, "An unlicensed floater is never allowed any place. A floater or itinerant peddler with a license from this Department is allowed to operate in certain areas of the City, but in certain other areas which are restricted he is not allowed to operate. In no event is an itinerant peddler allowed within 200 feet of a public market." He testified further that several floaters were operating in the market. He said there was a fish floater next to cart No. 505 and on being asked by the assistant corporation counsel, "Were there also other floaters near there?" his answer was, "There were; notably an apple floater next to the fish floater and two fruit and vegetable floaters who packed up their carts and moved away as the Inspector, Commissioner and I approached them."

The petitioner on being asked the question, "Did you have any difficulty with floaters in this area?" said: "Of course it is a daily problem. To begin with when you consider I have 10 blocks to patrol that when I am at 116th Street, these floaters who have been operating in the market according to themselves several years — some are ex-permitees, when I am at 116th Street, I could hardly be expected to detect floaters from 110th or if I am down around 110th Street I can hardly be expected to keep 116th Street clear. As Mr. Huse did testify when he and I reached 116th Street, March 24th, these peddlers did move." He was asked by the assistant corporation counsel: "Mr. Joyce, you have testified as to having some floaters arrested last Saturday. During the period from March 6th when you were assigned to the market and March 24th, did you issue any summonses?" To this question petitioner replied: "I could not issue a summons to a floater. In other words, a floater is a police problem."

Considering the large area to which the petitioner was assigned, it would seem quite clear that the explanation of the difficulties he had with floaters in his territory was entirely reasonable. As he pointed out, a floater is a "police problem." We believe that the evidence adduced to support this charge did not indicate that

the petitioner was guilty either of incompetence or misconduct. Consequently, the charge numbered (2) should have been dismissed.

Lastly we turn to the " failure to properly supervise the operation of a market area under his supervision," as summarized by respondents. This charge has to do with sidewalk obstruction, size of pushcarts and the failure on the part of the petitioner to compel those who had permits to keep the space under the carts and four feet outside thereof clear of refuse. Huse testified that he had made a specific note of six different sidewalk obstructions in the area. When asked what a sidewalk obstruction was, he testified: " To illustrate, Counsellor — in our licensed markets, a pushcart peddler with a license from us is allowed to operate a pushcart which will not exceed 6 feet in length. He is allowed to have extensions on the front extending out 16 inches. He is not allowed to have any boxes of produce or anything else on the sidewalk there in front of the cart or alongside the cart. In this instance, the extensions were north and south of the cart. So here, for example, when I mention cart 308 with 24 feet of sidewalk obstructions, it would mean that the pushcart extends for eight feet and north of it were boxes on the sidewalk extending 12 feet on the sidewalk and south of it were boxes on the sidewalk extending 12 feet, constituting a sidewalk obstruction." He was asked next by the assistant corporation counsel, " Is it a duty of the inspector in charge of a market to see that such violations do not exist? " To this he replied, " It is, as provided in Rule 14 of the Rules and Regulations." Turning to rule 14, it will be noted that it covers rules and regulations for the government of employees of the bureau of open air and inclosed markets of the department of markets.

Remembering, as we must, that the so-called market area under discussion was abolished by the board of estimate in February, 1938, we cannot see how this rule would have any application. In fact when the following question was asked of the witness, " Mr. Huse, is the area on First Avenue between 106th and 116th Streets a market area and was it a market area on the 24th of March? " he replied, " Not according to the Board of Estimate." If his answer was correct, and undoubtedly it was, then the rule relied upon could not be used as the basis for the removal of the petitioner. Let us assume, however, solely for the purpose of discussion, that rule 14 would apply, it seems to us that the explanation given by the petitioner, as to the condition which prevailed, should have carried conviction. He said: " If this can be properly stated, I would like to say that for what they used to call the Upper and Lower First Avenue Market, from my experience, has been

known as perhaps two of the most untidy markets. The condition of the pushcarts themselves are untidy. One pushcart is 36 years old, unpainted and very untidy. That has been the condition since the market was created. It is true that there were obstructions on the fronts and sides of the cart but it is a physical impossibility for one man to enforce the regulations to the letter. I believe it has never been done. I doubt very much whether it will be until the pushcarts are removed from the Avenue. * * * The majority of the peddlers up there sell Italian greens — stuff like rabe, spinach, broccoli — vegetables of that type which are bulky, and when they weigh it some of it falls on the ground and creates an unsightly appearance, hardly an unclean one. Of course, it is the inspector's job — my job — to see that that stuff is swept up and placed in a receptacle. It does happen at some minutes of the day, the pushcarts appear extremely untidy."

In addition to the foregoing, the petitioner testified to actual measurements he had taken of the pushcarts mentioned in the specifications, as distinguished from the method pursued by Mr. Huse in pacing off distances.

We do not wish to say that the commissioner in finding adversely to the petitioner was influenced by reason of the fact that he had preferred the charges. Nevertheless, we are inclined to the view that the charges were trivial in character and did not indicate that the petitioner should be removed for incompetency or misconduct within the meaning of subdivision 1 of section 22 of the Civil Service Law.

For the reasons assigned the determination should be annulled, with fifty dollars costs and disbursements, and the petitioner reinstated.

MARTIN, P. J., O'MALLEY, UNTERMYER and DORE, JJ., concur.

Determination unanimously annulled, with fifty dollars costs and disbursements, and the petitioner reinstated. Settle order on notice.